## Springton Pointe Associates v. Ledbetter

*Robert C. Houpt,* for plaintiffs.
*Rita K. Borzillo,* for defendants.

KEELER, *J.,* January 30, 1989—The necessity for this opinion was occasioned by plaintiffs' filing of an appeal of this court's order requiring plaintiffs to abide by the terms of a settlement agreement. Plaintiffs brought this action to enforce anti-speculation, approved developer and deadline for improvement clauses in a contract for the sale of realty. Plaintiffs, developers of an upscale real estate project, sought to maintain the prestige and quality of the neighborhood by employing such clauses in their land sale contracts. At the case's inception, plaintiffs' maintained that defendants, by failing to develop their raw land within certain prescribed time limits and by employing "unapproved" contractors, breached the sales agreement. Fortunately for all parties, the property values in this development have skyrocketed since defendants purchased their property. As a result, the parties developed several options as grounds for amicable resolution of the dispute. The first option, which has been referred to by counsel as "Plan A," would allow plaintiffs to repurchase the lot from defendants and envisioned the possibility that plaintiffs might pay the agreed

consideration over a period of time. The other option, appropriately denominated "Plan B," would permit defendants to retain the property upon payment of an additional sum of consideration and conditioned upon plaintiff's agreement to begin construction on the unimproved lot.

The parties agreed that the court's input with respect to the details of these plans might assist in finally resolving the entire case. Based on this joint request, the court held a settlement conference on May 31, 1988. At that time counsel for both parties outlined the basic premises of the two plans. They also expressed differences they had with respect to the fine points of these alternate solutions. The court, thereafter, recommended that "Plan A" be structured as follows: Plaintiffs would repurchase the lot from defendants for the sum of $215,000; plaintiffs would tender the sum of $75,000 on or before June 30, 1988 and the balance would be paid no later than December 31, 1988. If plaintiffs failed to tender the full consideration on or before September 1, 1988, then they would be subject to pay interest at the rate of prime plus one percent from September 1, 1988 until final payment. In addition, the court proposed that each party should bear its own share of the transfer taxes in such a transaction. With respect to "Plan B," the court suggested that defendants tender consideration to plaintiffs in the amount of $75,000 on or before June 30, 1988. This payment would serve as consideration to settle the lawsuit and allow defendants to retain the property. Both attorneys advised the court that they would have to discuss the various options and details of the plans with their respective principals.

After the conference, counsel discussed the court's suggestions. Plaintiffs' attorney told defense counsel that defendants would have until June 20,

1988 to decide which option they would prefer. Plaintiffs' counsel also commented that "Plan A" would be acceptable if the final payment date could be extended beyond December 31, 1988, as suggested by the court, to March 1989. Defense counsel agreed to discuss this with his clients. Later that day, defense counsel advised plaintiffs' counsel that "Plan A," as outlined by the court but with the March payment date, was acceptable.

At the same time, defendants desired to retain control of the property, if possible. Despite the agreement under "Option A," the parties continued to work toward an agreement under "Option B" which would allow defendants to keep and develop the lot. In accordance with the central premise under "Option B," the defendants tendered a check in the sum of $75,000 along with a written proposal for terms of settlement on June 17, 1988. This proposal addressed various details such as: how much time would defendants have to commence construction; what constituted commencement of construction; what monetary penalty would be imposed for defendants' failure to begin construction by the commencement date; and, identification of approved builders. On June 30, 1988, plaintiffs' counsel forwarded a counter-proposal which decreased the time available to commence construction and increased the penalties for failure to comply with this agreement. Defendants' counsel reviewed the counter-proposal with his clients and responded the same day that it was unacceptable. He also advised plaintiffs' counsel that they wished to proceed under "Plan A." On July 1, 1988, plaintiffs' counsel responded that "Plan A" was no longer available for acceptance since the June 20, 1988 deadline had expired.

This current dispute arises from a simple misconception that pursuit of an alternative settlement proposal precludes enforcement of a previously accepted option. Here, the parties agreed to the material terms of Plan A on May 31, 1988. Yet, defendants' preference was to pursue and keep the realty under an Option B proposal. Both parties negotiated toward this end. Defendants tendered the consideration suggested by the court on June 17, 1988 in an effort to keep "Plan B" viable. In the end, however, the parties could not reach a meeting of the minds on important aspects of this plan. The continued negotiations and efforts to work out "Plan B" does not vitiate the prior agreement of "Plan A." This is especially true where the basis for plaintiffs' position relies upon defendants' failure to comply with plaintiffs' counsel's unilaterally established deadline of June 20 for accepting one plan or the other. This court is unwilling to attribute devious purposes to plaintiff's counsel's inability to respond to the "Plan B" proposal of June 17 in a timely fashion. At the same time, the court cannot, in good conscience, permit plaintiffs to avail themselves of their attorney's logistical snafu to the grave detriment of defendants. Moreover, as the testimony shows, defendants would have elected to follow "Plan A" prior to the June 20 deadline if they had been apprised of plaintiffs' position on the "Plan B" proposal in a timely fashion. Had the parties agreed to terms under "Plan B," then "Plan A" could be abandoned by mutual consent. Thus, plaintiffs' contention that the continued negotiations under "Plan B" evinces the lack of an agreement under "Plan A" does not bear up to scrutiny. Rather, continued negotiations under either proposal suggests that the deadline had been waived.

Although not addressed at the time of the hearing on the motion to enforce settlement and apparently now raised as an afterthought, plaintiffs' maintain that the settlement is precluded by the Statute of Frauds. 33 P.S. § 1 et seq. (Purdon 1967). Yet, plaintiffs' cursory treatment of this argument fails to account for two well-established principles which relate to this statute. First, this particular section of the Statute of Frauds relating to interests in land constitutes a statement of public policy. *Brown v. Hahn,* 419 Pa. 42, 213 A.2d 342 (1965). See 33 P.S. § 1. It does not render oral agreements void. *Bethlehem Steel Corp. v. Tri State Industries,* 290 Pa. Super. 461, 434 A.2d 1236 (1981). Here, defendants seek a remedy for a breached oral contract for the payment of money in order to settle this case. They do not request specific performance of an obligation to transfer realty to themselves. Secondly, as the courts have noted, the Statute of Frauds is meant "to be used as a shield, not as a sword." *Fanin v. Cratty,* 331 Pa. Super. 326, 332, 480 A.2d 1056, 1059 (1984). See 2 Corbin on Contracts § 498 (1950) (The Statute of Frauds "is not to prevent the performance or enforcement of oral contracts that have in fact been made; it is not to create a loophole of escape for dishonest repudiators.") As Justice Musmanno has eloquently observed in reference to the Statute of Frauds:

"Ever since that venerable statute was armed with authority to prevent the assertion of verbal understandings regarding title to land, it has been called upon to strike down agreements which were not committed to writing. The laudable purpose of this guardian of truth is to prevent fraud and perjuries. Occasionally, however, an embattled property owner or prospective purchaser of land, summons the statute to enforce a condition which does not

seem to coincide with principles of honesty and fair dealing. In such cases, the courts should study the situation involved to make certain that the statute is not being used to perpetrate fraud and perjuries rather than prevent them."*Simplex Precast Industries Inc. v. Biehl,* 395 Pa. 105, 108-9, 149 A.2d 121, 123 (1959). This court's review of the present situation commends that the Statute of Frauds not be applied.

For the foregoing reasons, the court granted an order requiring plaintiffs to comply with the terms of the settlement agreement under "Plan A."